NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0480n.06

Case No. 17-3534

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 24, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| EILEEN L. ZELL, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| KATHERINE M. KLINGELHAFER; FROST | ) | DISTRICT OF OHIO |
| BROWN TODD LLC; JOSEPH J. DEHNER; | ) | |
| JEFFREY G. RUPERT; PATRICIA D. LAUB; | ) | |
| SHANNAH J. MORRIS; and DOUGLAS | ) | |
| BOZELL, | ) | **O P I N I O N** |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.

**McKEAGUE, Circuit Judge.** This legal malpractice suit all began with a family feud over money. In December 2000, Michael Mindlin borrowed $90,000 from his aunt, Eileen Zell, and agreed to pay her back in a year. The due date came, and Mindlin couldn't pay. A decade later, Mindlin and Zell went to court over the unpaid debt. Zell's son Jonathan—a lawyer since 1983—represented her. But as a self-proclaimed "non-practicing attorney with zero trial experience," Jonathan wanted other attorneys to double-check his work. Appellant Br. 18. So, he and Zell hired lawyers from Frost Brown Todd LLC ("FBT") to be Jonathan's co-counsel.

At the end of a contentious lawsuit, Zell lost her claim. Unhappy with that outcome, Zell had her son bring another lawsuit—this time, a legal malpractice case against the FBT attorneys

who helped Jonathan litigate her case. Not surprisingly, Zell lost again. The district court dismissed some of her malpractice claims at summary judgment and the rest at the end of a bench trial. Zell appeals both of those rulings as well as various evidentiary rulings made before and during trial. Finding no error, we affirm.

**I**

Mindlin promised to pay back the $90,000 he borrowed from his aunt Zell within a year. But by the time the due date rolled around, Mindlin could pay only a third of what he owed. For years, Zell seemed content to forgive the remaining debt—that is, until her son Jonathan took an interest in it.

Jonathan's interest piqued during a January 2009 meeting between him, Zell, and an estate-planning lawyer at FBT, Patricia Laub. At that meeting, the three of them discussed a one-million-dollar gift Zell planned to leave Jonathan. Jonathan wanted Zell to include her loan to Mindlin—which took the form of a promissory note—in the gift. But Laub advised against it, informing Zell and Jonathan that if the note remained uncollectable, it would dilute the gift. Nevertheless, for reasons unknown, Jonathan was adamant that the note be included.

He asked whether Zell could sue Mindlin to collect the remaining debt. Another FBT attorney, Jeffrey Rosenstiel, emailed Jonathan with the bad news later that day: Zell's claim was blocked by Ohio's six-year statute of limitations. Rosenstiel, however, suggested that Zell might not be completely out of options. He thought Missouri, where Mindlin lived, might not pose the same obstacles. He advised Jonathan and Zell to consult with "an attorney licensed in Missouri as soon as practicable" to avoid losing "the ability to bring this claim in a Missouri court if the Missouri statute of limitations should run." Shortly after that, Douglas Bozell (an FBT attorney licensed in Missouri) confirmed Rosenstiel's suspicions and emailed Laub that Missouri's statute

of limitations was more favorable. Laub passed the good news along to Jonathan and Zell. And since FBT had no office in Missouri, she offered to help them find an attorney in the state to represent them in a lawsuit before time ran out.

But Zell decided to let sleeping dogs lie—at least while Mindlin's mother (Zell's then 84-year-old sister) was still alive. So, despite the impending ten-year deadline, Zell waited to sue her nephew over the debt.

In the meantime, Mindlin learned that Zell was considering bringing him to court. On October 2010, eager to resolve things, Mindlin filed a declaratory judgment action against Zell in the Franklin County, Ohio Court of Common Pleas. *Mindlin v. Zell*, No. 10CVH-14965 (Franklin Cty. C.P. Oct. 12, 2011). At that point, Jonathan got back in touch with Laub to get FBT's help. Laub referred the Zells to Shannah Morris, one of the firm's litigation attorneys. Although Jonathan was happy for Morris's help, he made clear from the outset that he expected to remain intimately involved in case strategy, including drafting demand letters, deciding what settlement offers to accept, and taking a first shot at the pleadings. He and Morris together drafted an answer to Mindlin's declaratory judgment complaint and brought a counterclaim to enforce the note. But this attempted collaboration didn't last long. In May 2011, after Morris refused Jonathan's demands to tell the court that she was lead counsel—a statement Morris believed was untrue—she withdrew her representation with Jonathan's approval.

Jeffrey Rupert replaced Morris. Just as he did with Morris, Jonathan heavily restricted Rupert's role. Specifically, Jonathan did not permit Rupert to research issues without Jonathan's approval. And a month into the relationship, Jonathan notified Rupert that, from that point forward, Jonathan would be "the so-called 'lead attorney' or even the sole attorney" during the pretrial proceedings. R. 86-19, p. 2, Page ID 1629. Rupert's only function, according to Jonathan,

was to assist with research and correct "obvious and/or serious deficiencies" in pleadings drafted and signed by Jonathan. *Id.* (capitalization removed). Hearings, too, would be Jonathan's responsibility. Jonathan believed these limitations would relieve Rupert of having "responsib[ility] for the[] pleadings and, thus," allow him to spend less "time rewriting and/or perfecting [Jonathan's] drafts." *Id.* After receiving these instructions, Rupert arranged a meeting with Zell to ensure that she understood and approved of the division of labor instituted by her son. Jonathan also attended. Zell confirmed that Jonathan had full authority to act on her behalf. While acting on his mother's behalf, Jonathan rejected several settlement offers from his cousin, at times because the settlement terms would require Jonathan to give up his "secret desire to seek attorneys fees at the end of [the] case." R. 86-19, p. 1, Page ID 1628. Whether that "secret desire"—not to mention Jonathan's rejection of settlement offers—was known to Zell is unclear. In any event, with Jonathan at the helm, the litigation charged ahead.

On March 2012, Rupert left FBT, and Joseph Dehner worked with Jonathan through the end of the case. And in the end, Zell lost her claim to enforce the note. Just as Rosenstiel predicted two years earlier, the Franklin County Court of Common Pleas concluded that Ohio's six-year statute of limitations barred Zell's claim. *Mindlin*, No. 10CVH-14965. The Ohio Court of Appeals for the Tenth District affirmed. *Mindlin v. Zell*, No. 11AP-983 (Ohio Ct. App. Aug. 7, 2012).

For Jonathan and Zell, however the matter didn't end there. Blaming FBT for the outcome of the litigation, Zell—again, with Jonathan as her attorney—sued FBT and virtually every FBT attorney that ever touched her case. Zell asserted two primary acts of malpractice[1] against the

---

[1] Zell also asserted claims for breach of fiduciary duty and breach of contract, both of which arise from, and are therefore subsumed by, her claim for legal malpractice. *Dottore v. Vorys, Sater, Seymour & Pease, LLP*, 2014 WL 72538, 2014-Ohio-25, ¶ 35 (Ohio Ct. App. Jan. 9, 2014). Because the claims rise and fall together, this opinion's discussions related to the malpractice claims apply equally to Zell's other two claims.

attorneys. First, she said that FBT's attorneys erroneously advised her that Missouri's ten-year statute of limitations would apply to any action to enforce a note—even to an action brought in Ohio. Second, she asserted that the FBT attorneys failed to argue certain points before the trial court and thereby doomed her case on appeal.

On summary judgment, the district court dismissed Zell's malpractice claims against three of the attorneys as barred by Ohio's statute of limitations and allowed the rest of the claims to proceed to a bench trial. After the trial, the district judge granted the remaining defendants' Rule 52(c) motion for judgment on partial findings, concluding that Zell failed to prove her claims. The district court thus entered judgment in the defendants' favor and dismissed Zell's case.

## II

### A.  Summary Judgment

We start our review with Zell's appeal of summary judgment in favor of three of the defendants: Patricia Laub, Shannah Morris, and Douglas Bozell. The district court ruled that Zell's claims against them were barred by Ohio's one-year statute of limitations for legal malpractice claims and dismissed them from the case.

We review the court's ruling *de novo*, construing the facts in the light most favorable to Zell. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In Ohio, a cause of action for legal malpractice must be "commenced within one year after the cause of action accrued." O.R.C. § 2305.11(A).[2] A cause of action accrues upon the

---

[2] Because the court's jurisdiction is based on diversity of citizenship, Ohio's statute of limitations applies. *Blaha v. A.H. Robins and Co.*, 708 F.2d 238, 239 (6th Cir. 1983) (per curiam) (citation omitted).

occurrence of one of two events, whichever is later: (1) "when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney"; or (2) "when the attorney-client relationship for that particular transaction or undertaking terminates." *Smith v. Conley*, 846 N.E.2d 509, 511–12 (Ohio 2006).

We look first at the cognizable event. At the latest, that event was the Ohio trial court's October 12, 2011 summary judgment ruling dismissing Zell's claim to enforce the note as barred by Ohio's statute of limitations. At that point, Zell would have "discovered or should have discovered that [s]he ha[d] been injured by" the FBT attorneys' alleged erroneous advice that Missouri's statute of limitations would apply instead of Ohio's. *Smith v. Barclay*, 2012 WL 5378180, 2012-Ohio-5086, ¶ 24 (Ohio Ct. App. Nov. 1, 2012) (citation omitted). And once Zell had notice, her cause of action accrued. *Id.* Zell protests that the trial court's summary judgment opinion did not provide notice of a potential claim because she believed that decision would be reversed on appeal. But Ohio courts have rejected that line of reasoning, concluding that "a client is [not] entitled to exhaust all appellate remedies before the statute of limitations commences," even if there is a chance a decision forming the basis of the client's malpractice action may be subsequently overruled and the malpractice claim negated. *Zimmie v. Calfee, Halter and Griswold*, 538 N.E.2d 398, 402 (Ohio 1989).

Accordingly, looking at the cognizable event, Zell's malpractice action is untimely. It accrued on October 12, 2011, but Zell waited until May 10, 2013—well over a year—before commencing the action.

Nor is her action timely if the accrual date is measured from the date each attorney ceased representation. Normally, when an attorney-client relationship ends is an issue of fact appropriate

only for a jury to decide. *See Omni-Food & Fasion, Inc. v. Smith*, 528 N.E.3d 941, 944 (Ohio 1988). But here, the conduct terminating the relationship is so clear and unambiguous that a reasonable juror can reach only one conclusion and summary judgment is proper. *Koerber v. Levey & Gruhin*, 2004 WL 1344834, 2004-Ohio-3085, ¶ 19 (Ohio Ct. App. June 16, 2004) (citation omitted). The record makes the following clear. First, Zell and Jonathan met with Laub in January 2009 to discuss Zell's million-dollar gift to Jonathan and their options to enforce the unpaid Mindlin note. In February 2009, Laub told the Zells what Bozell emailed her—that Missouri's statute of limitations was ten years and there was still time to enforce the note there. Then, after Mindlin sued Zell in October 2010, Laub referred Zell and Jonathan to Morris, who assisted Jonathan with Zell's answer and counterclaim. With the Zells' blessing, Morris withdrew from the case in May 2011. Zell does not point to any evidence that Laub, Morris, or Bozell communicated with her or Jonathan or otherwise participated in her case beyond the above-identified dates. So even construing Zell's allegations in the light most favorable to her, no juror could find that these attorneys represented Zell anywhere close to or beyond May 10, 2012, a year before she filed this malpractice action.

To get around this result, Zell takes an inventive view of the facts and accuses FBT attorneys of playing a game of "hot potato" with her case. Appellant Br. 42. The way Zell sees it, each attorney misinformed her about the applicable statute of limitations and then intentionally passed her case off to someone else at the firm, hoping Zell wouldn't discover their error in time to sue. Zell even goes so far as to assert that later firm members helped protect their colleagues by filing an appeal simply to drag out the litigation and further delay Zell's ability to sue. She says that to avoid this injustice and hold these attorneys liable for their wrongs, the court should look at when Dehner—the last FBT attorney on her case—ended his representation and then impute

that date to every other FBT attorney because they all worked at the same firm. That would put the accrual date sometime in August 2012, making Zell's action timely.

No reading of the facts supports Zell's hot-potato theory. What the facts do show is an uneventful referral from Laub to Morris once Jonathan asked for help with the declaratory judgment action and a disagreement leading to Morris's removal from the case with the Zells' approval. But even if the facts were on Zell's side, Ohio law is not. In Ohio, "continuing representation of a client by a firm acting through several successive individual attorneys cannot extend the time to sue for alleged malpractice by any one of those individual attorneys." *Fisk v. Rauser & Assoc. Legal Clinic Co., LLC*, 2011 WL 5082232, 2011-Ohio-5465, ¶ 19 (Ohio Ct. App. Oct. 25, 2011). That rule would foreclose Zell's argument even if it had a modicum of merit.

Whether we look to the cognizable event or the end of the attorney-client relationships as the accrual date, Zell's malpractice claims against Laub, Morris, and Bozell were untimely.[3] We therefore affirm the district court's summary judgment ruling dismissing Zell's claims against them.

### B. Rule 52(c) Judgment on Partial Findings

We turn to the rulings made at the end of Zell's bench trial. After the parties rested their cases, the district court granted the remaining defendants' Rule 52(c) motion for judgment on partial findings (and denied Zell's identical motion), concluding that Zell failed to prove her

---

[3] Zell also asserts, presumably relying on this same "hot potato" theory, that the district court erred by denying Zell's June 2015 motion for leave to file a second amended complaint to add FBT associate Aaron Bernay as a defendant. Apparently, Bernay performed limited research in 2011 at Morris's request. The district court denied Zell's late request to add him to the action, concluding that even if Bernay had been named in the original complaint, Zell's claims against him would have been time-barred. This ruling was not an abuse of discretion. *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 853 (6th Cir. 2006) (denial of motion for leave to amend reviewed under abuse-of-discretion standard).

claims. Specifically, the district court found that Zell did not prove breach of duty or causation. Zell argues those findings were made in error.

Under Federal Rule of Civil Procedure 52(c), once a party has been fully heard on an issue at a bench trial, "the court may enter judgment against the party on a claim or defense that . . . can be maintained or defeated only with a favorable finding on that issue." We review a district court's factual findings on a Rule 52 motion for clear error. *Petty v. Metro. Gov't of Nashville & Davidson Cty.*, 687 F.3d 710, 720 (6th Cir. 2012).

Zell does not specifically challenge any of the trial judge's factual findings. Instead, she complains generally that the judge "blamed [Jonathan] for everything that went wrong in the Ohio action" but then—curiously—failed to hold Jonathan liable for malpractice. Appellant Br. 82. Of course, the district judge's failure to hold Jonathan liable would be less confounding to Zell and Jonathan if they considered the obvious: Zell didn't sue Jonathan. Instead, she sued the attorneys that Jonathan hired to review his own work. And Zell again relies on Jonathan to be her representative and mouthpiece in the present litigation, just like she did in the last one—despite Jonathan's repeated pronouncements that he lacks litigation skills and that his mother is, in effect, proceeding pro se. Perhaps liability rests with Jonathan. But that question isn't before the court. The district court found the evidence Zell presented insufficient to prove her case against the attorneys she chose to sue. Although Jonathan's brief is filled with outrage, not one word of it goes to any factual findings made by the district judge for us to review. We therefore affirm the district court's findings and dismissal of Zell's case.

## C. Motion for New Trial and Other Evidentiary Objections

Finally, Zell asserts that the district judge should have ordered a new trial based on alleged perjury by the defendants and erroneous evidentiary rulings that she asserts prejudiced her ability

to prove her case. We review the denial of a motion for a new trial for abuse of discretion. *Luna v. Bell*, 887 F.3d 290, 294 (6th Cir. 2018) (citation omitted).

### 1. Alleged Perjury

Zell first contends that she is entitled to a new trial because the defendants lied on the witness stand, making statements about the nature of their working relationship with Jonathan that directly contradicted what Jonathan laid out in various emails to FBT attorneys. But the content of the emails is entirely consistent with trial testimony and the entirety of the evidence supports the district judge's factual findings. In reality, Zell takes issue with the district judge's credibility determinations. But those determinations are "entitled to great deference on appeal." *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005). None of the emails to which Zell points casts doubt on the judge's credibility determinations, let alone proves that any attorney lied on the witness stand. Accordingly, we affirm.

### 2. Evidentiary Rulings

Zell next argues that the district court made several erroneous rulings related to the admission of evidence and witness testimony and disclosure of documents protected by attorney-client privilege. "We review the district court's evidentiary decisions for abuse of discretion, and we will reverse only when we find that such abuse of discretion has caused more than harmless error." *United States v. Johnson*, 440 F.3d 832, 847 (6th Cir. 2006) (citation omitted).

#### i. Jonathan's Testimony and Admission of Trial Exhibits

First, according to Zell, the district judge arbitrarily restricted the length of Jonathan's testimony and the quantity of exhibits allowed to be admitted. Jonathan testified at his mother's trial, with temporary substitute counsel, James Feibel, conducting the direct examination. Zell says that the trial judge ordered Mr. Feibel to limit questioning to 45 minutes and to introduce

various emails into evidence without letting Jonathan explain what each of the emails meant. She says that these restrictions prevented her from fully "counteracting FBT's perjurious testimony." Appellant Br. 36.

As can be said about virtually all of Zell's arguments, this one is based on fabrications about what happened at trial, supported by citations pulled out of context. A fair reading of the record shows that Mr. Feibel examined Jonathan for several hours over the course of two days. Before the close of testimony on day one, Mr. Feibel told the judge that he thought the remaining examination would last 45 minutes or less. Defense counsel also expected cross-examination to last no more than 45 minutes. However, at no point did the trial judge *order* the parties to limit their examination to a specified length of time. Additionally, Mr. Feibel reviewed Zell's exhibits with defense counsel to sift out those that had already been admitted and prevent duplication. Zell does not point this court to any order by the trial judge limiting the number of exhibits she was permitted to admit or any specific exhibit that she sought to admit but that was excluded. Instead, Zell complains about substitute counsel's strategic decisions at trial. Having no court order before us, we have no basis for finding an abuse of discretion.

### ii. Testimony of Yund and Blickensderfer

Zell also appeals the district judge's exclusion of trial testimony by FBT's CEO George Yund and FBT's loss-prevention partner Matthew Blickensderfer. Zell asserts that Yund's testimony was necessary to explain and verify the veracity of statements on FBT's website. The district judge determined that Yund's testimony was irrelevant because the parties had stipulated

to the authenticity of the webpage. Zell provides no reason why that decision was made in error. We conclude that it was not.

Zell also objects to the district court's denial of her request to cross-examine Blickensderfer regarding his alleged concealment of discovery materials to obtain favorable rulings on summary judgment and at trial. Zell's forceful allegations against Blickensderfer are, again, unsupported by the record. She points to nothing unusual or suspect about the discovery process and to no evidence that Blickensderfer attempted to thwart it in FBT's favor. The district court did not abuse its discretion in denying Zell's request to cross-examine Blickensderfer.

**D. Access to Privileged Emails**

Finally, Zell complains that the district court erroneously denied her unfettered access to emails in FBT's possession, including some privileged communications. Apparently, FBT submitted a privilege log identifying certain emails it said were protected by attorney-client privilege. The district court then conducted an in-camera review. It is not entirely clear what these emails consist of and why they were deemed privileged; the best that can be gleaned from the record is that many of them apparently concerned communications between attorneys at FBT regarding the present malpractice litigation. Regardless, while Zell generally decries being denied access to all of FBT's emails, she does not make any specific arguments that the district court *erroneously* concluded that some emails were privileged. Additionally, we are unable to locate the privilege log in the record. Accordingly, we have nothing to review. We can find no error based on Zell's general objection to being denied access to all emails in FBT's possession.

**III**

What began as a controversy over a $90,000 family loan has undoubtedly cost the Zells far more than that in legal fees. And the cost to family relationships may have been even greater.

Perhaps the one benefit to Jonathan is that after working on a trial and appeal for his mother in both state and federal court, he can certainly drop the label "non-practicing attorney with zero trial experience." His experience in this case, however, has done little to benefit his mother, and it ends with this ruling. We **AFFIRM** the judgment of the district court.